KOCH et al., Appellants,

v.

LIND, d.b.a. Transamerica Express Systems, et al., Appellees.

[Cite as *Koch v. Lind* (1997), 121 Ohio App.3d 43.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 96APE11–1577.

Decided June 19, 1997.

*Bressman & Sotak* and *David A. Bressman,* for appellants Wesley and Valerie Koch.

*Keener, Doucher, Curley & Patterson* and *W. Charles Curley,* for appellee Roger Lind, d.b.a. Transamerica Express Systems.

*Lane, Alton & Horst* and *William Scott Lavelle,* for appellee Columbus and Central Ohio Regional Multiple Listing and Multiple Listing Service.

DESHLER, Judge.

This is an appeal by plaintiffs, Wesley Koch and Valerie Koch, from a summary judgment granted by the Franklin County Court of Common Pleas in favor of defendants, Columbus and Central Ohio Regional Multiple Listing Service, Multiple Listing Service of Columbus Board of Realtors, Inc., and Roger Lind, d.b.a. Transamerica Express Systems.

Defendant Roger Lind is the owner of Transamerica Express Systems ("Transamerica"), a delivery service. Transamerica has an oral contract with defendant Multiple Listing Service of Columbus Board of Realtors, Inc., to deliver multiple listing service ("MLS") directories to realtors in the central Ohio area. The MLS directories (also referred to as "MLS books") are delivered on Thursday night to make them available to subscribing realty offices by the opening of each Friday business day.

Plaintiff Wesley Koch ("Koch") started delivering for Transamerica in 1992. Koch drove a route that began near downtown Columbus and then proceeded to the east side of town. Koch was paid $1 per stop for each book he delivered to a realty office.

Koch and the other drivers would go to Lind's house on Thursday evenings to pick up computer generated route sheets for that particular week. Later that night, the drivers would meet at a north Columbus location to pick up MLS directories that had been delivered by truck from Michigan. Once the books were loaded, the drivers would begin their routes. Generally, the books were

delivered and loaded around midnight, and it took Koch approximately six hours thereafter to complete his route.

On June 30, 1995, while delivering MLS books on his route, Koch was shot by two assailants on the east side of Columbus. On September 15, 1995, plaintiffs filed a complaint against defendants, alleging that defendants were negligent in failing to properly instruct, supervise, caution or assist Koch in delivering the MLS books. The complaint further alleged that requiring Koch to deliver books in dangerous neighborhoods at night constituted a deliberate and intentional act by defendants that made injury to Koch certain or substantially certain to occur.

Defendant Lind filed an answer on October 19, 1995. Defendants Columbus and Central Ohio Regional Multiple Listing Service and Multiple Listing Service of Columbus Board of Realtors, Inc. (collectively, "the Board") filed an answer on October 25, 1995.

On May 3, 1996, the Board filed a motion for summary judgment. Transamerica filed a motion for summary judgment on May 6, 1996.

By decision filed October 2, 1996, the trial court granted summary judgment in favor of all defendants. The decision of the trial court was journalized by judgment entry filed October 24, 1996.

On appeal, plaintiffs set forth the following two assignments of error for review:

"1. The trial court erred in finding that Defendants–Appellees Columbus and Central Ohio Regional Multiple Listing Service and Multiple Listing Service of Columbus Board of Realtors, Inc. were entitled to summary judgment as sufficient material facts and relevant law exist in Plaintiffs' favor.

"2. The trial court erred in finding that Defendant–Appellee Roger Lind was entitled to summary judgment as sufficient facts and relevant law exist in Plaintiffs' favor."

Plaintiffs' two assignments of error, which challenge the trial court's granting of summary judgment in favor of defendants, involve interrelated issues and will be addressed together.

Civ.R. 56(C) provides:

"Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation

and only from the evidence or stipulation that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in his favor."

In a summary judgment proceeding, the moving party "bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274. Further, "if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial * * *." *Id.*

We will first address plaintiffs' contention that the trial court erred in granting summary judgment in favor of Transamerica and in its determination that no genuine issues of fact existed as to Roger Lind's personal liability. In its decision sustaining the motion for summary judgment of defendant Roger Lind, d.b.a. Transamerica, the trial court initially found that summary judgment was proper as to the personal liability of Lind because plaintiffs had failed to present evidence that Transamerica was a sham corporation formed only for illegal or fraudulent purposes. The trial court further found, as a matter of law, that Koch was an independent contractor rather than an employee of Transamerica. Finally, the court found that Transamerica did not owe Koch a duty to warn of a dangerous condition, nor could plaintiffs show that Transamerica acted in an intentional manner such that harm to Koch was a substantial certainty.

Plaintiffs first contend that material issues of fact exist regarding whether Transamerica was formed as a sham corporation to avoid liability. Plaintiffs seek to pierce the corporate veil of Transamerica and thus hold Lind personally liable for Koch's injuries. In support of their argument, plaintiffs assert that the deposition testimony of Lind sets forth evidence that Lind's residence and Transamerica share the same telephone number, that all corporate stock is owned by Lind and that Lind is compensated by Transamerica via checks he writes. Plaintiffs maintain that such evidence amply indicates that Transamerica was established to avoid liability.

The trial court concluded that plaintiffs had failed to rebut evidence presented by defendant that the corporation was not formed for illegal or fraudulent purposes. Upon review of the record, we agree with the trial court's determination.

In *LeRoux's Billyle Supper Club v. Ma* (1991), 77 Ohio App.3d 417, 420–421, 602 N.E.2d 685, 687–688, the court noted:

"A corporation is a separate legal entity from its shareholders, even where there is but one shareholder. Generally, in such situations, only the corporation can be held liable for corporate obligations. Nevertheless, in certain circumstances, courts can 'pierce the corporate veil,' that is, disregard the corporate entity, and treat the shareholder and his Corporation as a single entity. * * * [T]he corporate entity will be disregarded and the individual shareholder or parent corporation held liable only where there is proof that the corporation 'was formed for the purpose of perpetuating a fraud, and that domination by the parent corporation [shareholder] over its subsidiary [corporation] was exercised in such manner as to defraud [a] complainant.' " (Citations omitted.) Quoting *North v. Higbee Co.* (1936), 131 Ohio St. 507, 6 O.O. 166, 3 N.E.2d 391, syllabus.

In the present case, plaintiffs' complaint contains no allegation that Transamerica was formed for fraudulent purposes, nor does the record on summary judgment set forth evidence which would raise a genuine issue of material fact on this issue. This court has previously held that "[t]he mere fact that a corporation has a single shareholder does not give rise to a reasonable inference that the corporation was created for a fraudulent purpose." *Ford v. Club S. Invest. Co.* (Dec. 16, 1986), Franklin App. No. 86AP–559, unreported 1986 WL 14482. Thus, evidence that Lind is the sole shareholder of Transamerica is insufficient to create an issue of fact regarding whether Transamerica is merely a sham corporation. Further, plaintiffs' unsupported allegation that Transamerica was formed to avoid personal liability does not present a material issue of fact. The "[a]voidance of personal liability is a proper purpose for creating a corporation." *Id.* See, also, *LeRoux's, supra,* 77 Ohio App.3d at 423, 602 N.E.2d at 689 ("One of the purposes of incorporation is to limit the liability of individual shareholders"). In sum, a review of the record before the trial court on defendant's motion for summary judgment indicates that plaintiffs failed to allege or prove that Transamerica was used by Roger Lind as a " 'cloak for fraud or illegality.' " *Id.,* quoting *E.S. Preston Assoc., Inc. v. Preston* (1986), 24 Ohio St.3d 7, 11, 24 OBR 5, 9, 492 N.E.2d 441, 446. Accordingly, we find that the trial court properly concluded that plaintiffs had failed to set forth a genuine issue of fact as to the personal liability of Roger Lind.

Furthermore, apart from the issue of Lind's personal liability, we find that the trial court properly concluded, as a matter of law, that Koch was an independent contractor, rather than an employee, of Transamerica. Thus, the trial court did not err in finding that Transamerica did not breach a duty of care owed to Koch based upon an employer-employee relationship.

In *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 524 N.E.2d 881, paragraph one of the syllabus, the court held that "[w]hether someone is an employee or an independent contractor is ordinarily an issue to be decided by the trier of fact.

The key factual determination is who had the right to control the manner or means of doing the work." The court in *Bostic* further held:

"The determination of who has the right to control must be made by examining the individual facts of each case. The factors to be considered include, but are certainly not limited to, such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts." *Id.* at 146, 524 N.E.2d at 884.

In support of its motion for summary judgment, Transamerica submitted the affidavit and deposition of Lind, the treasurer and sole shareholder of Transamerica. In his affidavit, Lind stated that the primary business of Transamerica, a delivery service, is the delivery of MLS books for the Board. Transamerica has a verbal contract with the Board to deliver the MLS books on a weekly basis.

In general, the MLS books arrive from Michigan just before midnight on Thursday nights. Lind stated that Transamerica hires "independent contractor drivers" to pick up those books from the truck and deliver them to recipients throughout central Ohio. Once the drivers pick up the books from the truck in north Columbus, the only time requirement imposed upon them is that deliveries are to be completed by 9:00 a.m. on Friday mornings. Drivers use their own vehicles, and they are not furnished with anything that would identify them as contractors or employees of Transamerica. Lind averred that neither he nor Transamerica exercised any control over the means or manner of delivery. Drivers are paid a flat rate per delivery rather than a salary or hourly wage; the order of deliveries is left to the discretion of the driver.

Koch completed an application and started making deliveries for Transamerica in 1992. Lind stated that it was understood and agreed between Koch and Transamerica that Koch was an independent contractor. Attached to Lind's affidavit was a copy of an "ACKNOWLEDGEMENT OF INDEPENDENT CONTRACTOR" agreement. Under the agreement, it was provided that Koch would receive $1 per "book stop." The agreement which Koch signed further provided:

"1. The undersigned shall be deemed to be an independent contractor and is not an employee, partner, agent, or engaged in a joint venture with TRANS AMERICA EXPRESS SYSTEMS, INC.

"2. Consistent with the foregoing, TRANS AMERICA EXPRESS SYSTEMS, INC. shall not deduct withholding taxes, FICA or any other taxes required to be deducted by an employer as I acknowledge my responsibility to pay same as an independent contractor.

"3. I further acknowledge that I shall not be entitled to any fringe benefits, pension, retirement, profit sharing or any other benefits accruing to employees."

Lind's affidavit stated that, pursuant to the terms of the above agreement, Transamerica did not withhold taxes, FICA or any other deductions from compensation owed to Koch.

The affidavit of Lind further stated that Koch delivered the books on "Route A," which included the near east side of Columbus. Lind averred that "[Koch] and I were both generally aware that this area of town was considered to be a high-crime area and that it could be dangerous, particularly at night." Lind further stated that, as long as the deliveries were made by 9:00 a.m. on Friday mornings, Koch "had complete discretion to make deliveries to areas that he considered dangerous during daylight hours and was never required to make deliveries to those areas at night." Lind recalled that, on one occasion, Koch specifically shifted the sequence of his delivery route to allow him to make deliveries to certain locations during the daylight hours. Lind further stated that Koch had never made any safety-related requests to Transamerica nor had he expressed any specific concerns about the job being too dangerous for him to perform. Finally, Lind stated that he was not aware of any other delivery drivers being assaulted, shot or robbed on Route A or on any other route handled by Transamerica drivers.

The record before the trial court on summary judgment also included the deposition testimony of Koch. Koch acknowledged that he was not required to make the route stops in any particular order. The portion of Koch's route that caused him the most concern involved an area between downtown Columbus and Bexley, encompassing east Broad Street to the north and Livingston Avenue to the south. Koch stated that, based upon what he had heard and read, it was his belief that this was "the area where more people are murdered than any place in Columbus." Because of concern for his safety, Koch tried to arrange his route so that he made deliveries to that area of town last, *i.e.*, during the daylight hours. The only restriction imposed by Lind on Koch's route was that he finish delivering the books by 9:00 a.m. on Friday morning.

Koch was not aware of any other MLS delivery drivers who had been the victims of violent crime. Koch stated that he had never told Lind that he wanted the order of his route stops to be altered.

Plaintiffs assert that genuine issues of fact exist regarding whether Koch was an employee of Transamerica based upon evidence indicating that all the materials were supplied by Lind, that the deliveries were dictated by a route sheet and that Koch was required to deliver the books by 9:00 a.m. We disagree.

In *Conway v. Calbert* (1997), 119 Ohio App.3d 288, 695 N.E.2d 271, Franklin App. No. 96APE08–1095, this court recently addressed a similar issue. In *Conway*, the issue was whether Robert Calbert, a carrier who delivered plastic bags containing advertising, was an employee or independent contractor of defendant Dispatch Consumer Services, Inc. ("DCS"). Under the facts of that case, the plaintiff slipped and fell on a plastic bag delivered by Calbert. Plaintiff brought a negligence claim against both DCS and Calbert, alleging that Calbert was an employee of DCS and, thus, that DCS was responsible for Calbert's allegedly tortious conduct. DCS moved for summary judgment, and the court granted the motion, holding that, as a matter of law, Calbert was an independent contractor as DCS did not have the right to control the manner or means of doing work and that Calbert was responsible to DCS only for the final product, *i.e.*, the successful delivery of the advertising materials to residences in Calbert's delivery area.

On appeal, this court affirmed the trial court's grant of summary judgment. Under the facts of *Conway*, the evidence indicated that DCS entered into written agreements with individuals to deliver plastic bags of advertising materials to households in specific geographic areas of central and northern Ohio. The agreement provided in part that a carrier was an independent contractor and was paid on a per-piece basis. Further, a carrier was not covered by workers' compensation, and was responsible for paying all taxes and expenses, as well as procuring his or her own insurance. A carrier was also required to furnish his or her own equipment and necessary supplies and was responsible for the satisfactory delivery of the advertising materials within the contracted area.

Further, the evidence indicated that Calbert's route coordinator called weekly to inform Calbert as to the list of materials he was to get that week, and DCS provided Calbert with a map of his delivery area containing "special instructions." It was left to Calbert's discretion as to which route to follow, and he was paid the same amount no matter how long it took him to deliver the materials.

On appeal, plaintiff asserted that DCS exercised control over the manner and means of work because "DCS instructed Calbert weekly what materials were to be placed in the bags and that he was instructed where to deliver the bags, when to deliver the bags, and how to deliver the bags." This court rejected plaintiff's contention, holding:

"Based on our review of the record, the material facts are not in dispute. Calbert set his own hours for delivery within the time frame set out by DCS. He furnished his own vehicle and used his family to help him complete his deliveries. Although provided a map of the delivery area, he was free to select the route and the order in which he delivered to the households in the delivery area. The contract was terminable at will with one week's written notice required. Pay-

ment was on the basis of the number of items delivered, four cents for the first piece of material in each packet and one-half cent for each additional piece of material. Calbert was responsible for his own taxes and expenses and was not covered by workers' compensation. The written agreement allowed the carriers to subcontract their duties. The facts show that DCS did not exercise or retain the right to exercise any significant degree of control or direction over the manner and means of delivery. Through its route coordinators, DCS checked on the end result, whether the plastic bags with advertising were delivered to the residences within the time frame specified. Calbert controlled the method by which the results were obtained. Accordingly, we agree with the trial court that Calbert worked as an independent contractor rather than as an employee of DCS." *Conway, supra,* 119 Ohio App.3d at 293, 695 N.E.2d at 274.

Similarly, in the instant case, the evidence indicates that Koch furnished his own vehicle, he was responsible for his own taxes, expenses and insurance, and he was paid by the number of books he delivered rather than the time spent to complete the route. Further, although he was provided a route sheet of his delivery area, Koch was "free to select the route and the order in which he delivered." *Conway, supra.* In fact, the evidence indicates that Koch had previously altered the order in which he delivered books on the route so that he could avoid driving in the most dangerous areas on the route until the daylight hours. The evidence also indicated that on approximately fifteen or twenty occasions during the time Koch drove the route, he chose not to make a delivery at a certain time out of fear that he might be in danger; rather, on those occasions he bypassed the stop and came back later when he believed it was safer. Thus, similar to *Conway,* the facts indicate that Koch controlled the method by which the results were obtained and that Transamerica was merely interested in the result rather than the manner in which the job was performed. Accordingly, the trial court did not err in holding, as a matter of law, that Koch was an independent contractor rather than an employee of Transamerica.

Plaintiffs next argue that the trial court erred in holding that Transamerica had no duty to warn Koch of the potential dangers involved in delivering the MLS books to certain parts of Columbus.

"The existence of a duty in a negligence action is a question of law for the court to determine." *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 270. In the instant case, the trial court noted that a duty to warn under Ohio law is normally predicated upon the superior knowledge by a business owner of a dangerous condition on its premises. See *Debie v. Cochran Pharmacy–Berwick, Inc.* (1967), 11 Ohio St.2d 38, 40 O.O.2d 52, 227 N.E.2d 603. The trial court found no duty to warn based upon the deposition testimony of Koch indicating that he was fully aware of the dangers involved.

■ The record supports the trial court's determination that Koch was aware that areas of his route posed a danger. Regarding the portion of his route between downtown Columbus and Bexley, Koch stated during his deposition that "I learned that many murders were done in that area." Koch was made aware of crime in that area of town through watching the news or reading newspapers, as well as his observations during the approximately three years he serviced the area. He indicated that, on one of the streets on his delivery route, an individual had been murdered at a stoplight. Koch also stated that, while driving on the route, he would "see groups of kids appearing like possible gang members that could have been carrying weapons * * *." Koch stated that in some areas, he was treated like an "alien," and that he was "sometimes cussed at or tried to be scared off." According to Koch, after he started the route in 1992 it took him a few months to realize that there could be dangers involved in traveling certain areas of the route at night. While there was evidence indicating that Roger Lind and the Board were generally aware that this area of town posed certain dangers, the record supports the trial court's finding that defendants did not possess superior knowledge of a dangerous condition to that of Koch, who traveled the route for approximately three years prior to the incident.

■ Further, even assuming the existence of a duty to protect, that duty would only encompass reasonably foreseeable criminal activity. *Rescigno v. Heyduk* (Aug. 15, 1996), Cuyahoga App. No. 69172, unreported, 1996 WL 465374. Plaintiffs essentially argue that awareness by Transamerica and the Board that MLS books were being delivered in a high-crime area of Columbus gave rise to a duty to use reasonable safeguards to protect Koch from the criminal acts of unknown third persons.

■ In general, an occupier of a business premises owes a duty of ordinary care to maintain its premises in a reasonably safe condition so that invitees are not unnecessarily and unreasonably exposed to danger. *Paschal v. Rite Aid Pharmacy, Inc.* (1985), 18 Ohio St.3d 203, 18 OBR 267, 480 N.E.2d 474. However, "[c]ourts have consistently required control as a predicate to liability because the possessor of land is in the best position to diminish the danger to invitees." *Simpson v. Big Bear Stores Co.* (1995), 73 Ohio St.3d 130, 133, 652 N.E.2d 702, 704. Thus, while the Ohio Supreme Court has held that "[a] business owner has a duty to warn or protect its business invitees from criminal acts of third parties when the business owner knows or should know that there is a substantial risk of harm to its invitees on the premises in the possession and control of the business owner," the court has further held that such duty "does not extend to premises not in the possession and control of the business owner." *Id.* at syllabus. The instant case does not involve an injury on a business

premises and we are unaware of any Ohio courts which have held, under similar facts, that a duty exists to prevent harm from unknown criminal assailants.

We note that other jurisdictions have held that "[t]he fact that crimes in general have occurred in an area or that a business is located in a 'high crime' area is insufficient to invoke * * * [a] duty." *Faheen v. City Parking Corp.* (Mo.App.1987), 734 S.W.2d 270, 273. In *Irby v. St. Louis Cab Co.* (Mo.App.1977), 560 S.W.2d 392, the plaintiff alleged that a cab company was negligent in dispatching an independent driver to a "known high crime area." The trial court dismissed the complaint for failure to state a claim. On appeal, the appellate court affirmed, holding:

"Appellant's petition alleges that the defendant owed plaintiff's decedent a duty of ordinary care to exercise discretion in disbursing [*sic*] cabs into the city of St. Louis, where foreseeability of criminal acts by third persons were known or should have been known by the defendant to have a high frequency of occurring. The apparent thrust of this allegation is that the knowledge of a 'high crime area' gives rise to a duty to take precautions against intentional criminal acts. It is true that in some circumstances, one may be charged with a duty of care to take precautions to protect others from intentional criminal acts or reckless conduct of third persons. * * * Such a duty arises, however, when one should realize through special facts within his knowledge or a special relationship that an act or omission exposes someone to an unreasonable risk of harm through the conduct of another. * * *

"We do not believe the facts as alleged imposed a duty of care upon the defendant to protect plaintiff's decedent against intentional criminal acts. The allegation of a 'high crime area' does not ipso facto mandate this duty. Such intentional criminal conduct on the part of unknown third persons is not reasonably foreseeable when viewed in the light of common experiences, even in 'high crime areas.' As stated in Prosser, Law of Torts [4 Ed. 1971], at 173:

" 'There is normally much less reason to anticipate acts on the part of others which are malicious and intentionally damaging than those which are merely negligent; and this is all the more true where, as is usually the case, such acts are criminal. Under all ordinary and normal circumstances, in the absence of any reason to expect the contrary, the actor may reasonably proceed upon the assumption that others will obey the criminal law. * * * ' " *Id.*, 560 S.W.2d at 395.

Again, the imposition of a duty of care is limited to reasonably foreseeable dangers. Under the facts of the instant case, it cannot be said that the defendants created the danger; further, we fail to see how defendants were any better able to anticipate or prevent the criminal acts of unknown third parties than the plaintiff who, as previously noted, was aware of the potential dangers in

that area of the city. Accordingly, we find that the trial court properly determined that no duty arose on the part of defendants.

Plaintiffs also contend that the trial court erred in failing to find that material issues of fact existed as to whether Transamerica committed an intentional tort.

In light of our determination that the trial court properly found, as a matter of law, that Koch was not an employee of Transamerica, we further find that the trial court did not err in granting summary judgment in favor of Transamerica on plaintiffs' claim for an intentional tort. Further, even assuming the existence of an employer-employee relationship, the facts of this case do not support a claim for intentional tort.

In *Fyffe v. Jeno's Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, paragraph one of the syllabus, the Ohio Supreme Court set forth the proof necessary to establish that an employer committed an intentional tort against an employee, holding that a plaintiff must show:

"(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. * * * "

Plaintiffs' basic argument is that Lind had knowledge that Koch was making deliveries in a dangerous part of town but failed to change Koch's delivery route. The trial court determined that the elements of *Fyffe* had not been met as plaintiffs could not prove that harm to Koch was a substantial certainty. We agree with the trial court that the evidence fails to show that Lind intended to produce the injuries to Koch. In the present case, the court held that "[n]o one could have predicted that this attack would occur," and noted that the evidence indicated that Koch had been delivering the MLS books for three years without incident and that no other drivers for Transamerica had ever been assaulted. In addition to the above facts cited by the trial court, the evidence also indicated, as previously noted, that Lind did not require Koch to make the deliveries in any particular order and that it was within the discretion of Koch to wait until daylight hours to deliver books to areas that he might consider to be dangerous at night.

Plaintiffs have failed to establish material facts which demonstrate that, despite defendant's knowledge of harm, defendant required Koch to continue to perform duties which were substantially certain to bring him harm. See *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 192–193, 532 N.E.2d 753, 755–757

(even assuming defendant's store was located in a high-crime area and even if defendant failed to equip its stores with security devices or provide its employees with training, it does not follow that defendant knew that injury to its employees was certain, or substantially certain, to result). Thus, the trial court properly found that no genuine issues of material fact existed as to plaintiffs' claim for an intentional tort.

We further find that the trial court properly granted summary judgment in favor of the Board. Plaintiffs essentially argue that the Board owed a duty of reasonable care to Koch and that it breached such duty; further, plaintiffs argue that the injuries to Koch were reasonably foreseeable.

In *Whitelock v. Gilbane Bldg. Co.* (1993), 66 Ohio St.3d 594, 597–598, 613 N.E.2d 1032, 1034–1035, the Ohio Supreme Court held:

"The general rule is that when one engages an independent contractor to perform an inherently dangerous task, the hiring party is not liable for injuries sustained by an employee of the independent contractor. *Wellman v. East Ohio Gas Co.* (1953), 160 Ohio St. 103, 51 O.O. 27, 113 N.E.2d 629. In *Hirschbach v. Cincinnati Gas & Elec. Co.* (1983), 6 Ohio St.3d 206, 6 OBR 259, 452 N.E.2d 326, we carved out an exception to the general rule. In *Hirschbach,* we held that '[o]ne who engages the services of an independent contractor, and who actually participates in the job operation performed by such contractor and thereby fails to eliminate a hazard which he, in the exercise of ordinary care, could have eliminated, can be held responsible for the injury or death of an employee of the independent contractor.' [*Id.* at syllabus.]

"Subsequently, in *Cafferkey v. Turner Constr. Co.* (1986), 21 Ohio St.3d 110, 21 OBR 416, 488 N.E.2d 189, we refined the holding in *Hirschbach.* In *Cafferkey,* we held that '[a] general contractor who has not actively participated in the subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work.' [*Id.* at syllabus.]"

In *Bond v. Howard* (1995), 72 Ohio St.3d 332, 337, 650 N.E.2d 416, 420–421, the court defined the term "actively participated" as follows:

"[F]or purposes of establishing liability to the injured employee of an independent subcontractor, 'actively participated' means that the general contractor directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, rather than merely exercising a general supervisory role over the project."

In the present case, the facts indicate that Koch was an independent contractor hired by Transamerica to deliver MLS directories pursuant to an oral agreement between Transamerica and the Board. The facts establish that the

58

Board did not actively participate in the activity which resulted in Koch's injuries. The undisputed evidence indicates that, while the Board provided the MLS books and a listing of Board members who were to receive the books, Koch never spoke with anyone from the Board regarding how to perform his work. Further, as previously noted, Koch's deposition testimony indicates that he made his own decisions regarding the order in which he delivered the books and that the only restriction was imposed by Lind, who required the books to be delivered by 9:00 a.m. Thus, reasonable minds could not conclude that the Board directed the manner in which Koch performed his duties.

Furthermore, we have previously concluded that the trial court properly held, under the particular facts of this case, that neither Lind nor the Board had a duty to protect Koch from the intentional criminal conduct of third persons. As noted above, while Lind and the Board were generally aware that certain areas of the city could be dangerous, the evidence does not support a finding that the Board possessed superior knowledge to that of Koch, nor was the Board in any better position than Koch to anticipate the dangerous condition. Finally, the facts as alleged do not give rise to a claim against the Board for an intentional tort by an employer. The trial court properly granted summary judgment in favor of the Board.

Based upon the foregoing, plaintiffs' first and second assignments of error are overruled, and the judgment of the trial court, granting summary judgment in favor of all defendants, is hereby affirmed.

*Judgment affirmed.*

LAZARUS and REILLY, JJ., concur.

ARCHER E. REILLY, J., retired, of the Tenth Appellate District, sitting by assignment.