OPINION
Plaintiff-appellant Tina Breeding appeals from a summary judgment against her on her claims against defendant-appellee Karen Smith for negligent entrustment, negligent supervision, nuisance and civil conspiracy, and on her claims against defendants-appellees the Board of Trustees of German Township, W.L. Wilcox and Dena Y. Neal, that they violated her constitutional rights.
We have reviewed the record in a light most favorable to Breeding, and conclude that the trial court did not err in rendering summary judgment against Breeding, because there are no genuine issues of material fact.
 I
Some time in August, 1997 at the home of defendant-appellee, Karen Smith, her son, Nicholas, invited his friend, Jeremiah Breeding over to play.[1] Karen Smith and Tina Breeding spoke with each other over the phone about the planned visit. Smith informed Breeding that she would not be at home, but that her daughter, Jennifer, would be home.
Breeding dropped Jeremiah off at the Smith residence on her way to work, and the two boys went out for a bike ride. When the boys returned to the Smith residence, Jennifer's friend, J.S., had come over to spend the night.[2]
Around 7:00 that evening, after Ms. Smith had departed, four older teenage boys arrived at the Smith residence. The four teenagers left the residence, but returned a while later with alcohol and a video camera. The four teenagers and the two girls proceeded to consume the alcohol. J.S. became intoxicated, and she and one of the boys went into a bedroom. While J.S. and the boy were in the bedroom, someone opened the bedroom door. J.S. and the boy were on a bed with a blanket over them.
At some point, J.S. and three of the older boys went to the basement of the Smith residence. The fourth boy repeatedly asked Jeremiah to take the video camera and to record what was going on in the basement. Eventually, Jeremiah agreed. He then took the camera down to the basement and videotaped J.S. being sexually abused by the older boys.
Eventually, the four older boys left. Later, Tina Breeding returned and picked up Jeremiah. When Karen Smith returned home, J.S. and Nicholas Smith were asleep, but Jennifer Smith was still awake. Jeremiah did not tell his mother about the events of the evening. Likewise, J.S., Nicholas, and Jennifer Smith did not inform their parents.
At some point, J.S. retrieved the tape from the home of one of the boys, and hid it at her house. The tape was later found by her mother who turned it over to the German Township Police Department in September, 1997. An investigation was opened, and defendant-appellant, Dena Y. Neal was assigned to conduct the investigation. No one contacted Breeding about the incident until May 21, 1998, when Karen Smith called her to tell her about it. Neal also contacted Breeding that same day to inform her that Jeremiah would have to testify before a grand jury. The older boys eventually pled guilty to various criminal charges associated with their actions.
On March 18, 1998, Breeding, both individually and as parent of Jeremiah, filed a lawsuit against multiple defendants, including among others, the Board of Trustees of German Township, German Township Police Chief, W.L. Wilcox and Officer Dena Y. Neal, and Karen Smith. The original complaint alleged numerous theories of liability against the various defendants for injuries sustained by Jeremiah by reason of being subjected to the behavior of the older boys and the two girls. The trial court dismissed six of the ten counts applicable to Karen Smith, all counts against the Township, and all but three counts against Wilcox and Neal. Breeding later amended her complaint which added new counts against the Township and the officers.
Counsel for the defendants took the discovery deposition of Jeremiah, during which they attempted to question him while reviewing the videotape. Breeding's attorney objected, and the deposition was continued. Breeding then filed a motion for a protective order to preclude the use of the videotape at the deposition. The motion was overruled by the trial court. Breeding appealed that decision to this court, but we dismissed the appeal for lack of a final appealable order.
The matter came before the trial court on various motions for summary judgment. The trial court granted summary judgment in favor of Smith, the township and the officers. The trial court also affirmed its prior decision to dismiss, pursuant to Civ.R. 12(B)(6), the claim of civil conspiracy against Smith.
From the judgments against her, Breeding appeals.
 II
Breeding's First Assignment of Error states as follows:
 THE TRIAL COURT ERRED WHEN IT WRONGFULLY DENIED APPELLANTS' MOTION FOR SUMMARY JUDGMENT AND WRONGFULLY GRANTED APPELLEE SMITH'S MOTION FOR SUMMARY JUDGMENT AS TO ALL CAUSES OF ACTIONS AGAINST KAREN SMITH.
Breeding contends that the trial court erred in granting summary judgment against her on her claims against Karen Smith for negligent entrustment, nuisance, loss of filial consortium, and civil conspiracy.
We begin with an examination of the standard for reviewing a decision granting summary judgment. "Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor." Zivich v. Mentor Soccer Club, Inc. (1998), 82 Ohio St.3d 367, 369-370. Our review of the appropriateness of summary judgment is de novo. With this standard in mind, we now examine each claim raised by Breeding.
Breeding argues that the trial court erred by granting summary judgment against her on her claim for negligent entrustment. Breeding cites Huston v. Konieczny (1990), 52 Ohio St.3d 214 as support for her claim that Smith was liable for negligent entrustment. We note that in her complaint, Breeding's claim is for "negligent supervision," not "negligent entrustment." It appears that Breeding uses the two terms interchangeably.
In Huston, the Ohio Supreme Court noted that "at common law, a parent is not ordinarily liable for damages caused by a child's wrongful conduct." Id., at 217. "However, liability can attach when the injury committed by the child is the foreseeable consequence of a parent's negligent act." Id. "In those circumstances, liability arises from the conduct of the parent." Id. There are several ways in which a parent may be held liable for the acts of their children.
First, "[p]arents may incur liability when they negligently entrust their child with an instrumentality (such as a gun or car) which, because of the child's immaturity or lack of experience, may become a source of danger to others." Id., at 217. Second, "[a] parent may also be held responsible for failure to exercise reasonable control over the child when the parent knows, or should know, that injury to another is a probable consequence." Id., at 217-218. "Finally, when parents know of the child's wrongdoing and consent to it, direct it or sanction it, they may be held liable." Id., at 218.
Here, Breeding claims that her son, Jeremiah, was injured as a result of being forced to view and videotape the sexual activity at the Smith house, involving J.S. and the four older boys. She argues that Smith is liable for Jeremiah's injuries because she "negligently entrusted her daughter, Jennifer, to care for Jeremiah, based upon several illegal acts committed both by Jennifer Smith and Karen Smith," and because she failed to exercise reasonable control over her daughter. Breeding's argument essentially combines the first two theories of parental liability as set forth in Huston, into one cause of action.
The claim for negligent entrustment fails for want of a dangerous instrumentality. In Houston, the court specifically stated that to support a claim for negligent entrustment, the parent must have entrusted the child with an instrumentality that may become a source of danger or that is inherently dangerous. The court gives cars and guns as examples of such instrumentalities. However, Breeding appears to suggest that Jennifer Smith was the dangerous instrumentality. Breeding does not cite, and we have not found, any support for her contention that the child, herself, may constitute the dangerous instrumentality.[3]
We next address the claim for negligence for failure to exercise reasonable control. In order to succeed on this claim, it must be foreseeable that injury is a probable consequence of the parent's failure to control. Injury is foreseeable if a defendant knew or should have known that his act was likely to result in harm to someone. Huston, supra, at 217.
Breeding argues that it was foreseeable that Jennifer Smith would consume alcohol and commit delinquent acts because Smith kept a stocked bar in the house and because she knew or should have known that her daughter had a proclivity for drinking alcohol.
The record establishes that, prior to this incident, Jennifer had consumed alcohol on three prior occasions of which her mother was aware. It also shows that Smith kept beer in her refrigerator and that she had a "three year old bottle of Kahlua" in the house.
Even accepting these facts as true, and that it was foreseeable that Jennifer Smith would drink alcohol, we cannot say that it was foreseeable that she would "commit [other] delinquent acts." In fact, there is no indication that Jennifer did commit other delinquent acts. There is no evidence to suggest that she was involved in the sexual activity or the taping of the incident, and there is no evidence to indicate that she initiated, or condoned, the criminal acts committed by the older boys.
Jennifer may have acted irresponsibly by permitting the older boys to enter her house while her mother was gone and by drinking the alcohol provided by the boys. However, this record fails to support a finding that Smith should have foreseen that these acts of her daughter would result in the commission of a crime by the older boys or the exposure of Jeremiah to the crimes. Accordingly, we find that the trial court did not err in granting summary judgment in favor of Smith on Breeding's claim for negligent entrustment.
We next turn to Breeding's claim that the trial court erred by rendering summary judgment on her claim for nuisance. Breeding's complaint alleged that Smith created a nuisance by permitting her residence to be used "for sexual activities and other abhorrent and lewd/obscene conduct." In her appellate brief, Breeding contends that Smith had a propensity to authorize the use of her home for teenage drinking, and that she thus, created and maintained a nuisance.
"As distinguished from absolute nuisance, `a qualified nuisance or nuisance dependent upon negligence consists of anything lawfully but so negligently or carelessly done or permitted as to create a potential and unreasonable risk of harm, which, in due course, results in injury to another.'" Conway v. Calbert (1997), 119 Ohio App.3d 288, 295, quoting, Taylor v. Cincinnati (1944), 143 Ohio St. 426, paragraph three of the syllabus. A qualified nuisance depends on proof of negligence. Taylor, at paragraph two of the syllabus.
Breeding contends that her arguments regarding Smith's negligence with regard to her negligent entrustment claim support her claim for nuisance. As stated above, we agree with the trial court's finding that Breeding failed to demonstrate that Smith was negligent with regard to Jeremiah. Therefore, we agree with the trial court's disposition of the nuisance claim.
Likewise, Breeding's claim for loss of filial consortium is without merit. The right of parents to make a claim for loss of filial consortium was first recognized by the Ohio Supreme Court in Gallimore v. Children's Hospital Medical Center (1993), 67 Ohio St.3d 244. Therein, the court stated that "a parent may recover damages, in a derivative action against a third-party tortfeasor who intentionally or negligently causes physical injury to the parent's minor child, for loss of filial consortium." Id., at paragraph one of the syllabus. "Consortium includes services, society, companionship, comfort, love and solace." Id.
The right to recover for this loss requires a showing of physical injury to the child resulting from the intentional or negligent actions of the tortfeasor. Breeding has shown neither. Therefore, we find that the trial court did not err in its disposition of this claim.
Finally, we address Breeding's argument that the trial court erred in dismissing her claim for civil conspiracy against Smith. In support, she recites the following facts:
 Smith [testified that she] did not tell Tina Breeding about the incident because Officer Neal told her not to contact anyone regarding the investigation of the incident. However, Officer Neal testified that Ms. Smith explicitly told her that she would notify Tina Breeding regarding the incident. Karen Smith claimed that she asked Officer Neal if she (Karen Smith) could contact Tina Breeding, but Officer Neal told her that she (Officer Neal) would contact Ms. Breeding since there was an ongoing investigation involved. Upon inquiry from Officer Neal, Karen told Neal that she did not know Tina Breeding's telephone number and that it was unlisted. However, Karen Smith later admitted that her son, Nick Smith had the telephone number, but she never asked Nick for the telephone number for Officer Neal.
Breeding argues that these facts "strongly suggest that Ms. Smith and Officer Neal's failure to notify Tina Breeding was not the result of innocent miscommunication between each other, but rather the result of a calculated effort to withhold information from Ms. Breeding."
She also argues that Karen Smith conspired with her mother, Sandra Landis, and stepfather, Theodore Landis, who was the Mayor of Germantown at the time, to withhold information from Breeding. In support, she cites the following evidence:
 After [J.S.'s mother] discovered the videotape, [she] telephoned Sandra Landis who came to their house and viewed portions of the tape. Ms. Landis was able to identify Ms. Smith's home as the location of the incident. Ms. Landis notified her husband of the incident. Ms. Landis contacted Ms. Smith about the tape as well, but did not contact Tina Breeding, even though Ms. Breeding is Mr. Landis' niece. Sandra Landis explicitly told Theodore Landis to not talk to anyone regarding the incident. Mayor Landis, however, admitted that his wife merely barred him from telling persons outside his family about the incident, which would not include Tina Breeding. Yet, Ms. Breeding was not told until nearly nine months later.
Civil conspiracy involves a malicious combination of two or more persons to injure another in person or property. Kenty v. Transamerica Premium Ins. Co. (1995), 72 Ohio St.3d 415, 419. It requires a "common understanding or design, even if tacit, to commit an unlawful act." Gosden v. Louis (1996), 116 Ohio App.3d 195, 219. "The malice involved in the tort is `that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.' " Williams v. Aetna Fin. Co. (1998), 83 Ohio St.3d 464, 475, citation omitted. An underlying unlawful act or tort is required before a party can prevail on a civil conspiracy claim. Gosden v. Louis (1996), 116 Ohio App.3d 195, 219-220.
In this case, the underlying unlawful act or tort alleged by Breeding is the failure to notify her of her son's having been present and having witnessed sexual activity among the teenagers. However, she does not cite any authority for the claim that the failure to notify her constitutes an unlawful act or tort.
Furthermore, even giving Smith the benefit of reasonable inferences, we conclude that the evidence fails to support her claim that Neal and Smith or Smith and the Landises conspired to withhold the information from Breeding. There is no evidence that Smith, Neal and Ms. Landis had any intent to withhold the information from Breeding.
The First Assignment of Error is overruled.
 III
The Second Assignment of Error provides as follows:
 THE TRIAL COURT ERRED WHEN IT WRONGFULLY DENIED APPELLANTS' MOTION FOR SUMMARY JUDGMENT AS TO ALL CAUSES OF ACTION AGAINST APPELLEES, BOARD OF TRUSTEES OF GERMAN TOWNSHIP, W.L. WILCOX, AND DENA Y. NEAL AND WHEN IT WRONGFULLY GRANTED SUMMARY JUDGMENT IN FAVOR OF THESE APPELLEES.
In this Assignment of Error, Breeding raises claims of violations of constitutional rights and statutory requirements. She contends that the Board of Trustees, Wilcox and Neal violated 42 U.S.C. § 1983 when they violated her constitutional right to be free from personal intrusion, her right to be informed of her child's presence at a crime, and her right to raise her child as she sees fit. Specifically, Breeding alleges that Neal and Wilcox failed to properly investigate the crime by failing to interview Jeremiah and by failing to notify her of Jeremiah's involvement.[4] In support, she provides the affidavit of a law enforcement expert, who opined that the police should have interviewed Jeremiah, and should have informed Ms. Breeding of her son's presence at the crime. Breeding next contends that the Board of Trustees violated Section 1983 by failing to properly train Wilcox and Neal and by failing to develop policies for parental notification. Finally, Breeding contends that the officers violated their statutory duty to report this as a case of child abuse to the appropriate child protective services agency.
The essence of a claim under Section 1983 is that a claimant has been deprived of a right secured by federal law. The statute states:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States, or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.
To succeed on a Section 1983 claim, the claimant must establish two elements: "(1) the conduct in controversy must be committed by a person acting under color of state law, and (2) the conduct must deprive the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States." 1946 St. Clair Corp. v. City of Cleveland (1990), 49 Ohio St.3d 33, 34, citing Parratt v. Taylor (1981),451 U.S. 527, 535.
Breeding sued Wilcox and Neal in both their official and individual capacities. Breeding fails to state any actions taken by Wilcox and Neal in their individual capacities that violated Section 1983. Therefore, we will confine our discussion to violations of Section 1983 in their official capacities, and we note that when governmental employees are sued in their official capacities, the suit is construed as being against the municipality itself. Will v. Michigan Dept. of State Police (1989),491 U.S. 58, 71.
Breeding's claims center on the failure to notify her of her son's involvement in the activities at the Smith home, and the failure of the township to train the officers and to establish a policy for notification. Breeding has cited, and we have found, no authority for her contention that the police had a duty to inform her of her child's presence in the crime being investigated or to interview her child as part of that investigation. Likewise, she has cited no authority for the contention that the Township had a duty to develop a policy regarding such notification, and in the absence of any statute or case law requiring such a policy, we decline to hold that the failure to promulgate such a policy violates any constitutional right. Finally, we find no evidence in the record to establish the claim that the Township failed to properly train its officers.
We also note that the Board of Trustees, and Wilcox and Neal raised the defense of qualified immunity. In Harlow v. Fitzgerald (1982),457 U.S. 800, the United States Supreme Court defined the doctrine of qualified immunity. Pursuant to Harlow, a person is immune from liability if he or she acts in such a way that the action does not violate clearly established law of which a reasonable person would have knowledge. Id. at 818. The general rule of qualified immunity is intended to provide government officials with the ability "reasonably [to] anticipate when their conduct may give rise to liability for damages." Davis v. Scherer (1984), 468 U.S. 183, 195. "Where that rule is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law." Anderson v. Creighton (1987), 483 U.S. 635, 646. The availability of qualified immunity is a question of law. Scott v. City of Columbus (Mar. 30, 2001), Franklin App. No. 00AP-689, unreported, citations omitted.
The question then, given these principles, is whether, viewing the evidence in a light most favorable to Breeding, a reasonable police officer would know that the failure to interview her son and notify Breeding violated her constitutional right to raise her child and be free from personal intrusion. We have not found, and again Breeding fails to cite, any relevant authority indicating that under facts similar to these, the failure to interview or notify a parent of the child's presence at a crime constitutes a constitutional violation.
Finally, we address the claim that R.C. 2151.421(D)(1) imposes a duty on police officers to report child abuse to a child protective services agency. That statute provides that "upon receipt of a report concerning the possible abuse or neglect of a child or the possible threat of abuse or neglect of a child, the municipal or county peace officer that received the report shall refer the report to the appropriate public children services agency."
As noted by the officers, the statute, by its very language, refers only to municipal or county peace officers. It does not mention township officers. The very next section of the statute, R.C. 2151.421(E), specifically mentions township authorities in the context of removing children from an abusive situation. The General Assembly did not place an affirmative duty to report on township officials. Had it wanted to do so, presumably it would have included township officials in the statute, as it did when it included township officials in a subsequent section of the same statute. Therefore, we decline to impose the statutory duty to report child abuse upon the township officers in this case.
We conclude that the trial court did not err in granting summary judgment in favor of the Board of Trustees, Wilcox or Neal. Accordingly, the Second Assignment of Error is overruled.
 IV
Breeding's Third Assignment of Error is as follows:
 THE TRIAL COURT ERRED BY DENYING APPELLANTS' MOTION FOR PROTECTIVE ORDER TO ENJOIN APPELLEES FROM REQUIRING JEREMIAH BREEDING TO VIEW THE "BREEDING VIDEOTAPE" AS A PART OF HIS DEPOSITION.
In this Assignment of Error, Breeding challenges the propriety of the trial court's decision to deny her motion for a protective order regarding the use of the videotape during Jeremiah's deposition. She contends that the use of the videotape was annoying and embarrassing for Jeremiah, and that it was also psychologically harmful to him. She also claims that it was not necessary to the development of evidence to require Jeremiah to view the tape. Finally, she contends that defense counsel committed a felony, in violation of R.C. 2907.31, by showing the tape to Jeremiah.
The "issuance of a protective order is discretionary." Transamerica Financial Services v. Stiver (1989), 61 Ohio App.3d 49, 53, citing, Civ.R. 26(C). "A trial court abuses its discretion when its actions are unreasonable, arbitrary, or unconscionable." Henneke v. Young (Aug. 10, 2001), Greene App. No. 2001-CA-4, unreported.
We note first that the videotape has not been made a part of the record before us. Therefore, we are unable to examine it in order to determine the validity of Breeding's claim that it was unnecessary for the defense to utilize the tape during Jeremiah's deposition or whether the trial court abused its discretion. Moreover, Breeding has failed to produce any evidence demonstrating that Jeremiah suffered emotional and psychological damage as a result of viewing the tape.
We reject Breeding's assertion that defense counsel committed a felony as an unwarranted and unprofessional claim. R.C. 2907.31 does criminalize, among other things, the exhibition of obscene or harmful material to juveniles. However, R.C. 2907.31(C)(1) provides that "it is an affirmative defense to a charge under this section, * * * that the material or performance was furnished or presented for a bona fide * * * * judicial or other purpose, by a * * * prosecutor, judge, or other proper person." In this case, it is clear that the use of the videotape was sanctioned by the trial judge, and was thus, arguably presented by the judge, as permitted by statute. Furthermore, we find that under the circumstances of this case, a lawsuit having been initiated based upon Jeremiah's involvement in the taping of the incident, with no indication that the videotape was presented for other than a bona fide judicial purpose, defense counsel were "other proper persons" to present the material under the terms of the statute.
Finally, we note that even if the trial court had committed prejudicial error by denying the motion for a protective order, at this stage, this court can do nothing to correct that error; and indeed, Breeding does not suggest, or ask for, any remedy therefor.
The Third Assignment of Error is overruled.
 V
All of Breeding's Assignments of Error being overruled, the judgment of the trial court is Affirmed.
WOLFF, P.J., and BROGAN, J., concur.
[1] At the time of the incident, Jeremiah was under thirteen years old.
[2] Jennifer Smith and J.S. were both fifteen years old at the time of this incident.
[3] We can envision a situation in which a person might be considered a dangerous instrumentality. For example, a woman with AIDS who works as a prostitute or a man with AIDS who commits rape might be considered a dangerous instrumentality because of the risk of spreading a deadly disease. However, that scenario is far different from the case before us.
[4] Breeding's complaint does not raise the issue of failure to interview or properly investigate. Rather, it focuses solely on the failure to notify her of the incident.